DEALY & SILBERSTEIN, LLP
William J. Dealy (WD 9776)
Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

*Attorneys for Plaintiff Harvey Kesner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HARVEY KESNER,

                      Plaintiff,

     - against -

HAYNES AND BOONE, LLP and TERRY CONNER,

                Defendants.
------------------------------------------------------------------X

Case No.:

**COMPLAINT**
ECF ACTION

**Jury Trial Demanded**

     Plaintiff HARVEY KESNER ("Kesner"), by his attorneys, Dealy & Silberstein, LLP,

complaining of the Defendants HAYNES AND BOONE, LLP ("HB") and TERRY CONNER

("Conner")(collectively, the "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.   This is an action for (1) breach of contract; (2) breach of a Partnership agreement; (3)

     common law fraud; (4) quantum meruit; (5) promissory estoppel; (6) breach of fiduciary

     duty; (7) tortious interference with business relationships; (8) defamation; (9) conversion

     (10) an accounting; and (11) attorneys' fees, arising out of the wrongful termination and

     expulsion in March 2009 of Plaintiff Kesner from Defendant HB, where he had been a

     member of the Partnership.

## JURISDICTION AND VENUE

2.  Jurisdiction of this Court is invoked under 28 U.S.C. § 1332, based upon diversity of citizenship. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

3.  Venue is proper in this district pursuant to 28 U.S.C. §1391, because the events giving rise to this claim occurred in this district.

## THE PARTIES

4.  Plaintiff Kesner resides in the State of New Jersey.

5.  Defendant HB is a Texas limited liability partnership with its principal place of business located at 2323 Victory Avenue, Suite 700, Dallas, Texas, 75219 and has offices throughout Texas, as well as in New York, Washington D.C., California, Mexico and Moscow. Defendant HB's New York office is located at 1221 Avenue of the Americas, 26th Floor, New York, New York 10020.

6.  At all relevant times, Defendant Conner has been the managing partner and Chief Executive Officer of Defendant HB, with a last known address of 7110 Lakewood Blvd., Dallas, Texas 75214.

## BACKGROUND FACTS

### Plaintiff Kesner's Recruitment By Defendant HB

7.  Plaintiff Kesner is a licensed attorney, who has been admitted to practice law in the State of New York since 1990.

8.  During his career, Plaintiff Kesner has practiced law as an attorney for the federal

government, several major national law firms and as a senior executive of a New York Stock Exchange listed company.

9.  In 2002, Plaintiff Kesner established a highly regarded, nationally recognized law practice focusing on corporate finance and securities transactions, representing mid-sized public and private companies, investors, high net-worth individuals, hedge funds, venture capital investors and others.

10. During 2006, Plaintiff Kesner was prospering as a Partner at a New York City law firm with approximately sixty (60) lawyers where he earned an annual compensation comparable to his starting compensation at Defendant HB. Plaintiff Kesner's compensation at this law firm was based upon a fixed component and a percentage of his collections from clients he introduced to the firm, which were approximately $2.3 million per year.

11. Plaintiff Kesner's law practice which experienced dramatic growth from 2001 through 2006, was very successful, and was earning in excess of approximately $2.5 million per year by 2006.

12. Prior to 2006, Plaintiff Kesner's practice had become quite well known to investors, investment bankers, clients, law firms and recruiters as a skilled corporate/securities transactional law practice valued by numerous public companies and private individual clients. Plaintiff Kesner prepared numerous client SEC filings and reports for clients and his views and opinions were frequently sought by leading industry and law periodicals.

13. During 2006, Plaintiff Kesner was approached by Defendant HB's legal recruiter, who informed Plaintiff Kesner that Defendant HB sought to have Plaintiff Kesner join Defendant HB as a Partner in charge of the New York Business and Securities Regulation Group of Defendant HB.

14. The legal recruiter represented to Plaintiff Kesner that Defendant HB was a newcomer to the New York City legal community, and that Defendant HB had embarked on an aggressive growth campaign to expand beyond its Texas roots.

15. Seeking to establish a national and international presence, Defendant HB had undertaken an aggressive recruiting drive, adding offices in New York, Washington, DC, and Moscow in furtherance of its adopted "Vision 2020 Plan".

16. Defendant HB's legal recruiter informed Plaintiff Kesner that Defendant HB sought self-starters with sustaining practices in New York City, and that Plaintiff Kesner fit that criteria and would be able to play a material role in the New York City office of Defendant HB, and in the firm generally.

17. As a result of these representations by Defendant HB's legal recruiter, Plaintiff Kesner agreed to meet with Defendant HB.

18. Defendant HB's legal recruiter also developed a list of additional firms for Plaintiff Kesner to meet with that would offer Plaintiff Kesner a similar role.

19. During preliminary meetings in New York, Houston and Dallas during 2006, Robert Wilson ("Wilson"), then managing partner of Defendant HB, Defendant Conner, then second in command at Defendant HB, and Kenneth Bezozo ("Bezozo"), head of Defendant HB's New York office, reiterated promises of the firm's commitment to its "Vision 2020 Plan".

20. Plaintiff Kesner made it known to Defendant HB that he was not simply interested in changing firms, but that his goal was to manage a practice group and head a department, anchored by his existing practice.

21. Plaintiff Kesner was asked to produce a forecast for his first year with Defendant HB as a

condition to HB making an offer of partnership to him

22. Pursuant to this forecast, Plaintiff Kesner's existing practice was projected to generate approximately $2.4 million in revenues for the first year of his association with Defendant HB.

23. Plaintiff Kesner required associates and senior attorneys in order to achieve this projection and Plaintiff Kesner was promised support from existing staff of Defendant HB who would service Plaintiff Kesner's workload as well as work on matters generated by other Partners of the firm, under Plaintiff Kesner's supervision as Partner in charge of Defendant HB's New York Business and Securities Regulation Group.

24. Prior to uprooting his practice and the employment of others, Plaintiff Kesner requested a meeting with Michael Boone, one of the founders of Defendant HB and a permanent member of Defendant HB's Board of Directors, for assurance that Defendant HB was committed to a New York City office for the long term; that Defendant HB would support the efforts of Plaintiff Kesner in building and anchoring a corporate and financial practice in the New York City marketplace; and that Defendant HB's goals in New York City were not experimental or transient.

25. During that meeting, Plaintiff Kesner was repeatedly assured by Michael Boone that Defendant HB's "Vision 2020 Plan" clearly expressed the firm's seriousness in its dedication and commitment to establishing a New York City presence.

26. Plaintiff Kesner was also assured that Defendant HB rarely, if ever, removes Partners other than in cases of disbarment or situations involving wanton unethical behavior.

27. Defendant HB represented to Plaintiff Kesner that if he were to move his successful and growing practice to Defendant HB, Defendant HB would provide Plaintiff Kesner with a

long term home where he could continue to grow his practice with enhanced support and a collegial atmosphere.

28. This sentiment was repeated by other Partners and management members of Defendant HB with whom Plaintiff met in New York and Texas during his interviews.

29. Defendant HB even touted its unique and attractive retirement program for Partners which Plaintiff would participate in as an inducement for Plaintiff to join Defendant HB.

30. In numerous meetings during the summer of 2006, Plaintiff Kesner was assured by Bezozo, head of Defendant HB's New York City office, that if Plaintiff Kesner were to move his practice to Defendant HB, he would become a "key player for HB in New York."

31. Bezozo further stated to Plaintiff Kesner that the way to make the most money at Defendant HB was to "develop the most business."

32. Plaintiff Kesner was informed that Defendant HB recognized contributions that were not purely economic, such as helping build the New York City practice group Plaintiff Kesner was to lead, which ultimately grew to eleven (11) attorneys in various corporate and transactional disciplines.

33. These themes were repeated by Wilson, then managing partner and CEO of Defendant HB, as well as others with whom Plaintiff Kesner interviewed during visits with Defendant HB's Texas Partners.

34. Defendant Conner also reiterated these themes to Plaintiff Kesner during meetings held in New York City and Texas.

35. Thereafter, on or about August 9, 2006, Defendant HB communicated a written offer to Plaintiff Kesner to join Defendant HB.

36. Later in August 2006, based upon the representations of Defendants, Plaintiff Kesner accepted Defendant HB's offer and agreed to move his practice to Defendant HB to head Defendant HB's New York Business and Securities Regulation Group (the "Practice Group").

37. In or around August 2006, a vote of the Partnership of Defendant HB was held (the "Partnership"), in accordance with the then existing Partnership Agreement of Defendant HB, and the admission of Plaintiff Kesner to the Partnership was approved by the requisite vote of the Partnership, meaning that it was approved by Partners who owned aggregate Partnership Percentage Interests equal to or greater than seventy-five (75%) percent of Defendant HB.

38. On August 11, 2006, Plaintiff Kesner and Defendant HB entered into and executed the Partnership Agreement (originally dated as of December 31, 1988, as amended through the date of execution by Plaintiff Kesner), which provides, _inter alia_, for the admission and compensation of Partners of Defendant HB, as well as for operation, management and distribution of profits.

39. Shortly thereafter, Plaintiff Kesner assembled a full complement of attorneys and other professionals to work with him in his Practice Group in Defendant HB's New York City offices, each of whom also terminated their existing prior positions based upon Defendant HB's promises and representations.

**Management Structure of Defendant HB**

40. The Partnership Agreement of Defendant HB, together with the Bylaws, is the key operative agreement, and governs all relations among Partners and the relationship of Defendant HB and its Partners.

41. The Partnership Agreement provides inter alia that it is governed by Texas law.

42. Section 4.02 of the Partnership Agreement provides for the establishment of an Executive Committee.

43. Sections 3.02, 3.03 and 3.04 require that each Partner share in the profits, and that losses are to be based upon a partner's "Partnership Percentage Interest" and gives the Executive Committee the authority to determine the "Partnership Percentage" assigned to new Partners, and changes thereto, as well as establishment of reserves and similar economic considerations.

44. Defendant HB also adopted Bylaws (the "HB Bylaws") in order to provide further rules with respect to the management and operation of Defendant HB.

45. The HB Bylaws include provisions governing the responsibilities of the "Executive Committee" of the firm.

46. The HB Bylaws state, in relevant part, that the "[t]he principal functions of the Executive Committee are to determine, from time to time, (i) the compensation of the Partners in the Firm . . ."

47. In accordance with the HB Bylaws "[t]he Managing Partner is the Chief Executive officer of the Firm and shall perform the duties and exercise the powers that customarily appertain to that title, and shall have other duties and responsibilities prescribed by the Executive Committee from time to time... including "day-to-day administrative and policy decisions concerning the entire Firm."

48. The Managing Partner at Defendant HB serves on the Executive Committee of the firm and is the Chairman of, and presides at all meetings of, the Board of Directors of Defendant HB.

49. Section 4.01 of the Partnership Agreement provides that the "financial and professional business and affairs of the Firm shall be managed by the Executive Committee, other committees and individual Partners(s), all in accordance with the Bylaws of the Firm . . . [which] may delegate to any Partners(s) or committee of Partners any power, responsibility, authority, or function granted to the Executive Committee."

50. Wilson served as Managing Partner of Defendant HB until 2008, when Defendant Conner assumed the role and title of Managing Partner.

51. Defendant Conner, at all times relevant to the claims herein, served as Managing Partner, CEO, member of the Board of Directors and member of the Executive Committee of Defendant HB, and was delegated authority to perform all responsibilities attendant thereto, subject to the Partnership Agreement and the HB Bylaws.

52. In his aforementioned capacities, Defendant Conner, at all times relevant to the claims herein, had the authority and responsibility to negotiate and bind the firm for the purposes of Plaintiff Kesner's compensation and Partnership Percentage Interest.

53. In his capacities as Managing Partner and Chief Executive of Defendant HB, Defendant Conner owes the highest fiduciary duty to serve the interests of the Partners of Defendant HB, including at all relevant times Plaintiff Kesner, including a duty of good faith and fair dealing.

54. The Bylaws further provide that "[d]eterminations regarding admissions or expulsions of Partners are subject to the ratification of the Board of Directors and are subject to Section 4.06 of the Partnership Agreement."

55. Section 4.06 of the Partnership Agreement contains requirements for voting and the Approval of Partners when action by Defendant HB is required for certain events.

56. Pursuant to Section 4.06, the expulsion of a Partner requires the vote of Partners "at a meeting called to consider the particular action" who own aggregate Partnership Percentage Interests of seventy-five (75%) percent or more.

**Plaintiff Kesner's Strong Performance at Defendant HB**

57. As a Partner at Defendant HB for approximately two and a half years, Plaintiff Kesner helped Defendant HB improve its New York City presence and expanded Defendant HB's reputation and national visibility as a leading corporate and securities practice in mid-cap and small-cap markets.

58. Plaintiff Kesner received repeated praise from many of his colleagues at Defendant HB for his efforts.

59. As Plaintiff Kesner's tenure at Defendant HB progressed, Defendant HB's management continued to represent that it would provide him with a platform, including high quality lawyers and administrative and support staff, which would assist and support Plaintiff Kesner in further expanding his Practice Group.

60. Many such representations came directly from Defendant Conner and other members of the Executive Committee and Board of Directors.

61. Defendant HB repeatedly encouraged Plaintiff Kesner to develop and grow his practice, hire additional attorneys, and advised Plaintiff Kesner to "overhire" so as to build capacity in the New York City office, which Plaintiff Kesner set out to accomplish by building a corporate and securities group that peaked in 2008 at eleven (11) attorneys and two (2) paralegals.

62. Plaintiff Kesner and other members of his Practice Group routinely billed in excess of 2200-2400 hours during 2007, their first year with Defendant HB.

63. Plaintiff Kesner and the members of his Practice Group were also responsible for managing client relations, frequent public speaking engagements, writing articles, and appearances for Defendant HB.

64. As Plaintiff Kesner's practice grew, he and Defendant HB developed a burgeoning national reputation in financial and business circles.

65. The growth and recognition benefited Defendant HB and the development of its New York City office, and Defendant HB continues to benefit to this day from the attorneys remaining in Plaintiff Kesner's former Practice Group.

66. Prior to Plaintiff Kesner joining the firm, Defendant HB was a virtual unknown in this sector of legal transaction representation in which his Practice Group specialized.

67. By 2008, Plaintiff Kesner's Practice Group at Defendant HB had grown to fourth in National League Tables for Private Investment in Public Equity ("PIPE") transactions, as reported by Deal Flow Media.

68. In Plaintiff Kesner's first year with Defendant HB in 2007, his business plan projected $2.4 million in revenue for Defendant HB, which would result in compensation due to Plaintiff Kesner in the approximate amount he had earned at his prior firm.

69. However, in the year 2007, Defendant HB actually earned approximately $7 million from Plaintiff Kesner's Practice Group.

70. This approximately $7 million in earnings for the Practice Group far exceeded the projected $2.4 million by approximately $4.6 million in fees collected by Defendant HB.

71. The Partnership Agreement provides for a bonus to Partners in circumstances in which extraordinary contributions have been made.

72. However, despite Plaintiff Kesner exceeding his Practice Group's collection projections by nearly $4.6 million during 2007, his efforts in expanding Defendant HB's New York City corporate department, and growing Defendant HB's national recognition and reputation, Defendant HB did not pay Plaintiff Kesner a bonus for his 2007 business successes.

73. During Plaintiff Kesner's approximate two and a half year tenure with Defendant HB, his Practice Group collected cumulative billings in excess of $12 million with approximately $1-2 million of additional receivables collectible by Defendant HB following Plaintiff Kesner's wrongful termination and expulsion in March 2009.

74. Plaintiff Kesner's Practice Group at Defendant HB regularly exceeded expectations despite the onset of the most severe recession in twenty (20) years, hourly rate increases imposed by Defendant HB that were significantly higher than the rates that Plaintiff Kesner had previously charged, and other changes implemented by Defendant HB that Defendant HB knew or should have known could limit the development of the New York City Practice Group.

75. Throughout 2008, Plaintiff Kesner continued to receive praise and encouragement from Defendant HB management and Partners in the form of emails, phone calls, and personal remarks for the successful expansion of Defendant HB's New York City office.

76. In fact, in 2007, Bezozo was elevated to the Board of Directors of Defendant HB, in part, on the strength of the success and expansion of Defendant HB's New York City office.

**Offer By Defendant HB and Acceptance By Plaintiff Kesner of "2 Year Plan"/Compensation Agreement**

77. In an effort to familiarize himself with compensation scales for New York City Partners in similar sized practice groups, Plaintiff Kesner surveyed his options in New York City and

commenced dialogue with a number of New York City law firms, consultants and legal recruiters.

78. Based upon his knowledge of the New York market, Plaintiff Kesner realized that his compensation at Defendant HB, i.e. approximately fourteen (14%) percent of his Practice Group's collected revenues, was far below market compensation for successful group leaders in similar practices.

79. Consequently, Plaintiff Kesner commenced discussions with other law firms seeking to obtain an offer of engagement with another firm.

80. At the same time, Plaintiff Kesner sought to renegotiate his compensation with Defendant HB.

81. During these negotiations, Defendant HB agreed to fairly compensate Plaintiff Kesner and to grant Plaintiff Kesner an equitable adjustment of his compensation.

82. For his part, Plaintiff Kesner continually repeated his commitment to Defendant HB and his desire to have a long term relationship with Defendant HB.

83. However, despite Defendant HB's repeated representations that it would adjust Plaintiff Kesner's compensation, Plaintiff Kesner became concerned when his negotiations with Defendant HB began to drag on without an agreement being reached.

84. Plaintiff Kesner informed both Bezozo and Defendant Conner in numerous calls and meetings that Plaintiff Kesner was considering leaving Defendant HB with his Practice Group if Defendant HB did not improve and solidify its offers to adjust Plaintiff Kesner's compensation.

85. Plaintiff Kesner, in reviewing the marketplace, learned that a practice of this magnitude in

New York City was at the top echelon of the market and could command compensation significantly higher than Plaintiff Kesner was receiving at Defendant HB, including a multi-year commitment of between $2.5 to $3 million in compensation per year.

86. Negotiations between Plaintiff Kesner and Defendant HB continued for several months. However, the parties were too far apart. As a result, Plaintiff Kesner continued to go on interviews with the objective of relocating his practice.

87. Finally, in December 2007, Defendant HB made an improved compensation offer to Plaintiff Kesner.

88. This offer was communicated to Plaintiff Kesner first telephonically and then was confirmed in writing.

89. This offer by Defendant HB, categorized as a "2-year plan" promised Plaintiff Kesner compensation of $1.6 million for 2008 and a minimum of $2 million in 2009, plus a contribution on Plaintiff Kesner's behalf to Defendant HB's defined benefit plan in 2009 (the "2 Year Compensation Agreement").

90. Furthermore, as part of the 2 Year Compensation Agreement, Defendant HB offered Plaintiff Kesner an immediate bonus in the amount of $100,000.00 in January 2008 if Plaintiff Kesner stopped seeking employment elsewhere.

91. Additionally, as part of the 2 Year Compensation Agreement, Defendant HB agreed to pay Plaintiff Kesner an additional bonus in the amount of $100,000.00 payable in January 2009, if Plaintiff Kesner was to remain with Defendant HB through that date.

92. Plaintiff Kesner accepted the terms of the 2 Year Compensation Agreement and ceased his search for alternative employment.

93. Defendant HB acknowledged its offer of the 2 Year Compensation Agreement in an email from Defendant Conner to Plaintiff Kesner dated February 4, 2008 stating:

> "Bonus is and was contingent on your accepting our 2008 compensation proposal—thought you had accepted when we last talked, but have since learned I was wrong about that, which is unfortunate. If we can close loop on 2008 compensation proposal then very happy to get bonus amount sent ASAP."

94. Defendant HB further acknowledged Plaintiff Kesner's acceptance of the 2 Year Compensation Agreement in an email from Jim Miller to Plaintiff Kesner dated February 7, 2008 stating:

> "Terry has approved an increase in your draw from $25,000 to $40,000…This will go into effect on February 15, 2008…P.S.- Your $100,000 bonus payment will be sent overnight."

95. Defendant HB performed the terms of the 2 Year Compensation Agreement, including payment of both $100,000.00 bonuses, due in January 2008 and January 2009, evidencing Defendant's offer and Plaintiff Kesner's acceptance of the 2 Year Compensation Agreement.

96. Plaintiff Kesner and Defendant HB agreed that the bonuses included in the 2 Year Compensation Agreement to be given to Plaintiff Kesner were to be from Defendant HB's revenues.

97. The $100,000.00 bonus paid to Plaintiff Kesner in 2008 was paid from Defendant HB's revenues.

98. However, and as detailed further herein, while Plaintiff Kesner was led to believe that the $100,000.00 bonus he received in January 2009 was derived from Defendant HB's revenues, he subsequently learned that the $100,000.00 bonus he received in January 2009 was actually drawn from his Capital account at Defendant HB, rather than from Defendant HB's revenues.

99. In addition, Defendant HB never made the promised contributions on Plaintiff Kesner's behalf to Defendant HB's defined benefit plan in 2009.

## Plaintiff Kesner's Wrongful Termination By Defendants and Expulsion From Defendant HB

100.    On January 16, 2009, Defendant Conner spoke with Plaintiff Kesner by telephone.

101.    During this telephone call, Defendant Conner informed Plaintiff Kesner that he had made the decision to end Defendant HB's relationship with Plaintiff Kesner.

102.    Defendant Conner did not offer any explanation as to why he and Defendant HB intended to breach the Partnership Agreement and to violate the 2 Year Compensation Agreement agreed to by Defendant HB and Plaintiff Kesner.

103.    Defendant Conner informed Plaintiff Kesner that he must leave Defendant HB by the end of February 2009.

104.    Based upon Defendant Conner's representations, Plaintiff Kesner feared he would be "locked out" of his office with no means to satisfy his obligations to clients.

105.    Plaintiff Kesner resisted Defendant Conner's instructions that he had to leave Defendant HB.

106.    However, Defendant Conner persisted, and submitted draft separation agreements which he informed Plaintiff Kesner he had to sign.

107.    The terms of these separation agreements, which Plaintiff Kesner refused to sign, released Defendant HB and its partners from all liability for breach of the Partnership Agreement and the 2 Year Compensation Agreement and  obligated Defendant HB to pay Plaintiff Kesner a nominal "per diem" separation payment until he withdrew from the

Partnership.

108.    The proposed separation agreements contemplated payments to Plaintiff Kesner at a level far below that required by the 2 Year Compensation Agreement, in a daily amount of just several hundred dollars per day, and required Plaintiff Kesner to withdraw from the Partnership no later than the end of March 2009.

109.    Defendant Conner represented to Plaintiff Kesner that the Partnership of Defendant HB was "resolute" in the decision that Plaintiff Kesner had to leave the firm.

110.    However, upon information and belief, Defendant Conner's efforts to expel Plaintiff Kesner from the Partnership were conducted without any authority from the Partnership.

111.    Upon information and belief, Defendant Conner acted "ultra vires" in terminating Plaintiff Kesner as a Partner of Defendant HB and violating Plaintiff Kesner's 2 Year Compensation Agreement with Defendant HB.

112.    Defendant Connor forcibly removed Plaintiff Kesner from the Partnership of Defendant HB without a vote of the Partnership and by exerting maximum pressure on Plaintiff Kesner to leave.

113.    Defendant Conner intimated that if Plaintiff Kesner would just accept the proposed separation agreement, he would be willing to tell Defendant HB's attorneys that Plaintiff Kesner and the firm simply could not reach financial terms for the ensuing year and that Plaintiff Kesner had chosen to leave of his own will.

114.    In fact, after Plaintiff Kesner left Defendant HB, Defendant Conner provided false information to the media regarding Plaintiff Kesner's departure from Defendant HB.

115.    Defendant Conner's misrepresentations to the media regarding Plaintiff Kesner's

separation from Defendant HB caused Plaintiff Kesner embarrassment in his profession and damaged his ability to gain new employment.

116.    Plaintiff Kesner refused to sign a separation agreement with Defendant HB and reiterated that Plaintiff Kesner wanted to continue his relationship with the firm.

117.    Without any regard whatsoever to the impact on the firm's clients, Plaintiff Kesner was effectively barred from performing his duties for his clients.

118.    On February 26, 2009, Defendants HB and Conner sent Plaintiff Kesner a written directive ordering him not to accept any new clients or work on any new matters.

119.    Thereafter, during February 2009 and the first part of March 2009, Defendants HB and Conner proceeded to dismantle Plaintiff Kesner's Practice Group by terminating associates, Of Counsel, and other administrative staff working for Plaintiff Kesner's Practice Group.

120.    During this period, Defendants HB and Conner deprived Plaintiff Kesner of access to the firm's resources to maintain his practice and to serve his clients.

121.    By letter dated March 11, 2009, a lawyer for Plaintiff Kesner informed Defendants that their actions constituted an anticipatory repudiation of the Partnership Agreement as well as the 2 Year Compensation Agreement, and demanded Defendants complete performance under the two (2) agreements.

122.    The March 11, 2009 letter also demanded that Defendants HB and Conner cease and desist from publishing false statements concerning Plaintiff Kesner.

123.    The March 11, 2009 letter further stated that if Defendants did not respond by the close of business on March 12, 2009, Plaintiff Kesner would deem his agreements as having been anticipatorily repudiated and Plaintiff Kesner would be left with no choice but to conclude

that Defendants had no desire to resolve the matter amicably.

124.    Defendants replied in a letter dated March 12, 2009 stating in pertinent part that:

> "We have now learned that Mr. Kesner has effectively withdrawn from the partnership, though without giving the notice required by the Partnership Agreement…We believe the Firm has been more than fair in its dealings with Mr. Kesner, particularly given the reasons for the separation. We assume that your letter constitutes a rejection of our pending separation proposal and the Firm will proceed accordingly."

125.    As a result of Defendants' response on March 12, 2009, Plaintiff Kesner was terminated from his employment with Defendant HB effective as of March 13, 2009.

**Failure to Pay Plaintiff Kesner For Work Performed In March 2009 and The January 2009 Bonus Required By The 2 Year Compensation Agreement**

126.    Defendant HB informed Plaintiff Kesner when he joined as Partner that he was to receive a semi-monthly draw.

127.    Upon information and belief, Partners get paid distributions in arrears semi-monthly by Defendant HB.

128.    On March 13, 2009, Defendants deposited into Plaintiff Kesner's bank account his first semi-monthly draw representing payment for the first two (2) weeks of March 2009, in the amount of $39,145.82.

129.    Later that same day, Defendants, without Plaintiff Kesner's permission, somehow reversed the $39,145.82 deposit from Plaintiff Kesner's account.

130.    As a result, Plaintiff Kesner was not paid the draw owed to him for the two (2) weeks he worked for Defendant HB in March 2009.

131.    Following his termination from Defendant HB in March 2009, Plaintiff Kesner learned that the $100,000.00 bonus that he had received in January 2009 pursuant to the terms of the

agreed upon 2 Year Compensation Agreement, had not been paid to him out of Defendant HB's revenues, but had instead been improperly deducted from Plaintiff Kesner's own Capital account at Defendant HB.

132.    Accordingly, rather than pay Plaintiff Kesner the $100,000.00 bonus, which it was obligated to do and purported to have done, Defendant HB in actuality just paid Plaintiff Kesner with his own money.

133.    At no time was Plaintiff Kesner informed by Defendant HB that Defendant HB would be withdrawing or had, in fact, withdrawn, the $100,000.00 from Plaintiff Kesner's Capital Account, nor did Plaintiff Kesner ever give Defendant HB any authority to do so.

134.    Defendants' heinous behavior forced Plaintiff Kesner into immediate unemployment, loss of benefits, loss of insurance for himself, his wife and his minor children, and severe hardship for himself and for his family.

135.    Moreover, Defendant HB retained several attorneys whom Plaintiff Kesner had brought to Defendant HB, and who subsequently began competing with Plaintiff Kesner in an attempt to retain the client relationships Plaintiff Kesner had built over many years.

136.    Defendant HB also interfered with valid requests by clients to transfer files to Plaintiff Kesner and interfered with Plaintiff Kesner's ability to represent and service the needs of his clients.

137.    All told, Defendant HB kept over $12 million in collections from Plaintiff Kesner's Practice Group received entirely from new clients who never previously had known or engaged Defendant HB and who became HB clients solely as a result of Plaintiff Kesner's efforts and relations, including over $300,000.00 alone during the months of January 2009 and February 2009 during the events leading up to Plaintiff Kesner's termination from

Defendant HB.

138.    In addition, Defendant HB retained valuable receivables and equity in clients, and the goodwill and franchise value of Plaintiff Kesner's practice built by Plaintiff Kesner over the previous seven (7) years.

139.    Defendants' acts and omissions have served to damage Plaintiff Kesner's reputation.

140.    Defendants' acts have been motivated by a desire to take Plaintiff Kesner's law practice and clients away from him.

141.    Defendants' acts and omissions have served to damage Plaintiff Kesner financially.

142.    Defendants' acts and omissions have served to damage Plaintiff Kesner's lifetime earning capacity.

**Continuous Tortious Interference By Defendant HB With Plaintiff Kesner's Practice and Defamation HB of Plaintiff Kesner by Defendant HB**

143.    Upon information and belief, in or around May 2010, Defendant HB communicated false and defamatory information to Plaintiff Kesner's current and prospective clients, colleagues, and other attorneys in the New York City area, to the effect that Plaintiff Kesner "is dirty" in the manner in which he conducts business.

144.    Upon information and belief, in or around May 2010, Defendant HB communicated false and defamatory information to Plaintiff Kesner's current and prospective clients, colleagues, and other attorneys in the New York City area, to the effect that Plaintiff Kesner was "terminated due to questionable practices."

145.    Upon information and belief, in or around May 2010, Defendant HB communicated false and defamatory information to Plaintiff Kesner's current and prospective clients, colleagues, and other attorneys and professionals in the New York City area, to the effect that Plaintiff